Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

DAVID EDADES,                           )
                                        )
         Plaintiff,                     )
                                        )
    vs.                                 )
                                        )
HCR, INC., doing business as HOPE       )
COMMUNITY RESOURCES, and                )
HOPE COTTAGES,                          )
                                        )
         Defendant.                     )
_____)
Case No. 3:05-cv-00230-(TMB)


DEPOSITION OF DAVID EDADES

Pages 1 - 98, inclusive

Tuesday, May 30, 2006, 10:05 a.m.

Anchorage, Alaska




Taken on behalf of the Defendant
at
Davis Wright Tremaine
701 West 8th Avenue, Suite 800
Anchorage, Alaska


EXHIBIT A
Page 1 of 8

DAVID EDADES                                              3:03-cv-00230-(TMB)
May 30, 2006

### Page 14

1   A.  (Reviews document.)
2       This policy when I was ISS, not in the
3   HAC.
4       MR. JOSEPHSON: I think the question was
5   whether you had seen it before.
6       THE WITNESS: Yes.
7   BY MR. JULIUSSEN:
8   Q.  You had seen it before?
9   A.  Yes.
10      MR. JULIUSSEN: Why don't we mark this as
11  Exhibit 2.
12      (Exhibit 2 marked.)
13  BY MR. JULIUSSEN:
14  Q.  Take a look at that.
15  A.  (Reviews document.)
16  Q.  Do you recognize what's been marked as
17  Exhibit 2?
18  A.  Yes, sir.
19  Q.  And what is it?
20  A.  It's -- it's a policy of Hope.
21  Q.  And this is an acknowledgment that you
22  received a copy of the personnel policy manual; is
23  that correct?
24  A.  Yes, sir.
25  Q.  And that's the manual that you looked at

### Page 15

1   earlier?
2   A.  Yes, sir.
3   Q.  The one that is dated 7/1 of 1999?
4   A.  Yes, sir.
5   Q.  Correct?
6   A.  Uh-huh.
7   Q.  And this is your signature that appears on
8   this page?
9   A.  Yes, sir.
10  Q.  And you signed that you received a copy of
11  this policy manual on 7/21 of 1999; is that
12  correct?
13  A.  Uh-huh.
14  Q.  And it also says that you read, understand
15  and will abide by all of the rules, regulations,
16  directives and policies contained in the personnel
17  policy manual; is that right?
18  A.  Yes, sir.
19  Q.  And you did read it, didn't you?
20  A.  I did.
21      MR. JULIUSSEN: Mark this as Exhibit 3.
22      (Exhibit 3 marked.)
23  BY MR. JULIUSSEN:
24  Q.  Now, you can take all of the time as you
25  want to look, Mr. Edades, as you want. That is to

### Page 16

1   look at that, but I want to explain, for the record,
2   what it is.
3       The policy manual that I showed you, the
4   complete manual that you said you had received a
5   copy of earlier, what this is, is just four pages
6   out of it. And you'll note when you're reviewing it
7   that the cover page is the same, and then I've
8   included the second page, just for reference
9   purposes.
10      And then what I've done is I've taken page
11  13 and 14 from that same manual. And I want you to,
12  when you're reviewing it, let me know if this is the
13  same as the one you're now looking at. Okay?
14  A.  (Reviews document.)
15      MR. JULIUSSEN: Let's go off record for a
16  second.
17      (Off record.)
18  BY MR. JULIUSSEN:
19  Q.  Mr. Edades, you've had an opportunity to
20  look at what's been marked as Exhibit 3, correct?
21  A.  Right.
22  Q.  Is that the same as what you looked at
23  earlier in the personnel manual?
24  A.  (Nods head.)
25  Q.  And this was the personnel manual that you

### Page 17

1   received --
2   A.  Yes, sir.
3   Q.  -- a copy of, correct?
4   A.  Right.
5   Q.  Now, if you look at the last page of
6   Exhibit 3, this talks about a sleep time policy,
7   does it not?
8   A.  Uh-huh.
9   Q.  And it states that "All employees, who are
10  scheduled to work as a team coordinator." Do you
11  know what a team coordinator is?
12  A.  Yes.
13  Q.  That was the same thing as a HAC?
14  A.  Yes, sir.
15  Q.  So all employees who were scheduled to
16  work as a team coordinator are required to live in
17  24 hours a day. What did that mean?
18  A.  You have to live in 24 hours a day.
19  Q.  That's in some home that's owned by --
20  A.  Hope.
21  Q.  -- Hope, correct?
22  A.  Yes, sir.
23  Q.  So you were required to be on the premises
24  24 hours a day, correct?
25  A.  Right.

EXHIBIT A
Page 2 of 8

5 (Pages 14 to 17)

SUMMIT COURT REPORTING       907/264-6776

DAVID EDADES  
May 30, 2006  
3:03-cv-00230-(TMB)

**Page 18**

1  Q. And during that 24-hour period, it was
2  expected that 16 hours would be work time?
3  A. Yes, sir.
4  Q. And that eight hours would be sleep time,
5  correct?
6  A. Yes.
7  Q. And you were aware of that policy,
8  correct?
9  A. Yes. That's what I'm fighting for that.
10 Q. Correct.
11     And so what this would mean, that each
12 day, at least for the first five days, you would
13 have been paid eight hours of straight time and
14 eight hours of overtime, correct?
15 A. Yes, sir.
16 Q. And then on the sixth and seventh day you
17 would have been paid 16 hours of overtime, correct?
18 It would have all have been overtime?
19 A. Yes.
20 Q. Is that correct?
21 A. Yes, sir.
22 Q. Generally, what was your sleep time
23 period? Was it supposed to be 10:00 to 6:00, or was
24 it 11:00 to 7:00 or something else?
25 A. 10:00 to 6:00, supposed to be.

**Page 19**

1  Q. Now, the policy goes on to say that sleep
2  time does not constitute paid working time,
3  correct?
4  A. Yes, it depends.
5  Q. Is what the policy says.
6  A. Depends, sir.
7  Q. And it says that if an employee does not
8  get at least five hours of uninterrupted sleep
9  during the scheduled sleep period, then the entire
10 sleep period counts as time worked --
11 A. Yes, sir.
12 Q. -- correct.
13    And if you do not get five hours of
14 uninterrupted sleep you must report the sleep
15 disturbance the following morning to your
16 supervisors --
17 A. Right, sir.
18 Q. -- so arrangements can be made for time
19 off to sleep.
20    Now, it's your position that you should
21 have been paid for 24 hours for every day that you
22 worked; is that correct?
23 A. Yes. Because of the situation of the
24 individual.
25 Q. Because?

**Page 20**

1  A. Of the situation of the individual.
2  Q. So what you're saying is, is you did not
3  get at least five hours of sleep every night?
4  A. I get, sir, but it depends -- depends on
5  that -- the individual. They get 24 hours -- 24
6  hours' supervision.
7  Q. It's not what I'm talking about. I'm
8  talking about your sleep time. Did you sleep at
9  night?
10 A. I sleep with -- then they start, I going
11 to wake up.
12 Q. Did you get five hours of sleep
13 uninterrupted most nights?
14 A. Sometimes I got uninterrupted sleep.
15 Q. Sometimes you did not get interrupted?
16 A. Right.
17 Q. So some nights you got eight hours of
18 sleep and you didn't get interrupted?
19 A. Some, yes. Yes, sir.
20 Q. And sometimes you did get interrupted?
21 A. Yes.
22 Q. And what did you do when you got
23 interrupted? And I'm not talking about taking care
24 of a resident or something like that, but the next
25 morning you were supposed to report that to your

**Page 21**

1  supervisor --
2  A. Right.
3  Q. -- correct?
4  A. Yeah, report.
5  Q. And you did that each and every time?
6  A. Yes, sir.
7  Q. Now, there was also an incident report
8  that you were required to fill out; is that
9  correct?
10 A. Incident report, right, I reporting that,
11 sir. That incident report, I have to report that.
12 Q. And so every time your sleep was
13 interrupted you wrote it on the incident report; is
14 that correct?
15 A. Yes, sir. I write down -- if I -- the
16 thing is, if we submit our time card, get
17 explanation on those -- on those -- on this
18 overtime, they need explanation of why you get
19 overtime.
20 Q. And if you provided the explanation, you
21 got paid, correct?
22 A. Yes, sir. Yeah.
23 Q. And if you did not provide an explanation
24 because you did not report it, you did not get paid,
25 correct?

EXHIBIT A  
Page 3 of 8

6 (Pages 18 to 21)

Page 22

1  A. Right.
2  MR. JULIUSSEN: Let's mark this as
3  Exhibit 4.
4  (Exhibit 4 marked.)
5  BY MR. JULIUSSEN:
6  Q. Take a moment to look at that and then
7  we'll talk about it, Mr. Edades.
8  A. (Reviews document.)
9  Okay.
10 Q. Do you know what that is?
11 A. A time card, sir.
12 Q. Your time card?
13 A. Yes, sir.
14 Q. And that's for the pay period ending
15 September 16th, 2001; is that correct?
16 A. Yes, sir.
17 Q. Who filled out this time sheet?
18 A. This one?
19 Q. Yes.
20 A. Me, sir.
21 Q. So the first page of this is something you
22 filled out?
23 A. Yes, sir.
24 Q. That's all your handwriting?
25 A. Yes, sir.

Page 23

1  Q. The dates and the hours?
2  A. Right, sir.
3  Q. The totals are yours?
4  A. Right, sir.
5  Q. And that's your signature down on the
6  bottom?
7  A. Yes, sir.
8  Q. And that says, "I affirm that the above is
9  a true and correct record of the hours worked by me
10 on behalf of Hope Community Resources, Inc."
11 A. Yes, sir.
12 Q. That's what it says. And was this a true
13 and accurate record?
14 A. Yes, sir.
15 Q. Of the hours worked?
16 A. Yes, sir.
17 Q. So on 9/3, the first day, you worked 16
18 hours, correct?
19 A. What date is that?
20 Q. On Monday, 9/3. It's the first date on
21 this form.
22 A. On the 9/3?
23 Q. Yes, 9/3.
24 A. Yes, sir.
25 Q. That would be September 3rd, correct?

Page 24

1  A. Yes.
2  Q. On that day you worked a total of 16
3  hours, correct?
4  A. Right, sir.
5  Q. And you were paid for all the time on that
6  day that you worked?
7  A. Yes.
8  Q. So they don't owe you any money for that
9  day?
10 A. On that day.
11 Q. Okay.
12 A. On that day -- that's what I said, on the
13 different situation. That's why -- that's why I --
14 I'm thinking some unpaid -- unpaid -- unpaid
15 overtime because of 24 hours. I'm not talking about
16 16 hours; I'm talking about 24 hours. On the 16
17 hours they paid me, right, they paid me. But on the
18 24 hours, they don't pay me.
19 Q. Well, we'll get to that in a minute. But
20 on this particular day you reported only that you
21 worked 16 hours, correct?
22 A. Right, sir. Yeah.
23 Q. And you didn't report that you were
24 awakened during the night and had to attend to any
25 of the resident's care, correct?

Page 25

1  A. Yes, sir.
2  Q. So that night you got eight hours of
3  sleep, correct?
4  A. Right.
5  Q. All right. Now, if we look down on the
6  13th, on Thursday, the 13th?
7  A. Uh-huh.
8  Q. What happened on that day; do you recall?
9  Not the specific, but it appears as though you
10 worked more than 16 hours that day, correct?
11 A. Where is that?
12 Q. Down on the 13th, Thursday, the 13th. Do
13 you see that?
14 A. Yes, sir.
15 Q. It says eight hours of regular time and 12
16 hours of overtime; does it not?
17 A. Yes.
18 Q. And so that would be a total of 20 hours
19 that you were paid for that day; is that correct?
20 A. Uh-huh.
21 Q. Now, why would it be that you would be
22 paid for 20 hours on that day?
23 A. I don't remember. But I think if I get --
24 it depends on that -- I put over here, maybe I get
25 the school, or they got -- they wake up, whatever,

Page 26

1  sir. I don't know. I don't remember.
2      Q. You don't remember --
3      A. Yes, sir.
4      Q. -- but you said that you worked extra
5  hours that day --
6      A. Yes.
7      Q. -- and they paid you, correct?
8      A. Right, sir.
9      Q. And if we looked at the incident reports
10 we would probably see some explanation of what
11 happened; is that correct?
12     A. Right, sir. Uh-huh.
13     Q. And going back to the first day, this
14 September 3rd, up at the top of that sheet. If we
15 looked at an incident report for that day, there
16 wouldn't be any incidents noted, would there?
17 Because you didn't get your sleep interrupted that
18 night, correct?
19     A. Yeah. Yeah. Is that 9/3?
20     Q. Right.
21     A. Yes, sir.
22     Q. So if we looked at the incident report
23 from 9/3, we wouldn't see anything written down
24 there by you concerning that evening, correct?
25     A. Right, sir.

Page 27

1      Q. So we talked about on the 13th you got
2  paid an additional four hours, a total of 20 hours
3  for that day.
4      A. Uh-huh.
5      Q. And if you look at the next day, the 14th,
6  the same thing happened, didn't it?
7      A. Right.
8      Q. So once again, apparently, your records
9  indicated that you were responding to the resident's
10 needs or something during the night?
11     A. Yeah, I think you're right.
12     Q. And they paid you for it, correct?
13     A. Yes, sir.
14     Q. And in fact, each and every time during
15 your employment that you reported that you worked
16 extra hours you were paid for it, were you not?
17     A. When I worked?
18     Q. Correct.
19     A. Yes. Yes. But what I said, it depends
20 what I'm -- I'm running for on this -- in this
21 case.
22     Q. But you were paid for every hour that you
23 put on one of these time sheets?
24     A. Yes, sir.
25     Q. And so every time you wrote it down, even

Page 28

1  when you wrote down that you worked 24 hours, you
2  were paid, were you not? If you wrote down that you
3  worked 24 hours, you were paid?
4      A. They have to pay me.
5      Q. Correct. And they did pay you?
6      A. Yes, sir.
7      Q. And every week, or every two weeks when
8  you submitted one of these reports, you signed that
9  it was a true and correct record of the hours you
10 worked?
11     A. Right.
12     Q. And it was true and correct, correct?
13     A. Depends on that papers.
14     Q. But you're the one who filled these out?
15     A. Can I explain why? Why I'm claiming 24
16 hours?
17     Q. Just a minute. If you would answer this
18 question. You filled this out, right?
19     A. Yes, sir. Yes.
20     Q. And you knew what hours you worked when
21 you filled it out?
22     A. Yes, sir.
23     Q. So you reported your hours and then you
24 signed it?
25     A. Right, sir.

Page 29

1      Q. Okay. All right. Now you wanted to
2  explain why it is you think you should have been
3  paid for 24 hours every day; is that what you're
4  going to do?
5      A. Yes, sir.
6      Q. Okay.
7      A. Okay. According to the -- according to
8  that plan of care of Max Scheme (ph) and Brad Homey
9  (ph), they get 24 hours --
10     Q. At this time I'm going to caution you not
11 to divulge what is privileged health care
12 information. You can be held liable for it, as can
13 Hope. So you can talk about a plan of care, but
14 don't talk about it with respect to a specific
15 individual. Okay?
16     A. How can I explain, sir, if you don't like
17 me to talk about?
18     Q. Just don't use the names.
19     MR. JOSEPHSON: Just don't use the names.
20 Just don't use someone's name.
21     THE WITNESS: Brad and Max need 24
22 hours.
23     MR. JOSEPHSON: Talk about it in terms of
24 clients and your responsibility, rather than giving
25 the names for the present time. Okay?

EXHIBIT A
Page 5 of 8

DAVID EDADES  3:03-cv-00230-(TMB)
May 30, 2006

### Page 38

1  job description that was in place at the time that
2  you first joined Hope.
3    A. Yes.
4    Q. But is the position similar?
5    A. On ISS, yes.
6    Q. And while you were a HAC --
7    A. Yes, sir.
8    Q. -- you supervised the ISS's who worked in
9  the home, correct?
10   A. Right, sir.
11   Q. In fact, that's what this job description
12 says, is that the Individual Support Specialist is
13 supervised by the Home Alliance Coordinator?
14   A. Yes, sir.
15   Q. Now, if you look at Exhibit 6, this
16 appears to be a job description for a Home Alliance
17 Coordinator that was effective November 13th of
18 2001.
19   A. Yes, sir.
20   Q. Have you seen this job description before,
21 or a copy of this job description?
22   A. I don't remember, sir. I think, yes. I
23 don't remember.
24   Q. Is this job description and the list of
25 duties, are those the types of duties that you were

### Page 39

1  responsible for performing as a HAC?
2    A. Yes, sir.
3    Q. Is there anything that is on this job
4  description that was not one of your
5  responsibilities?
6    A. No.
7    Q. In a minute we're going to talk about the
8  reasons that led to your termination, or at least
9  what Hope says about that.
10   A. Yes, sir.
11   Q. But before we do that, I want to talk
12 about the part of your lawsuit that talks about the
13 real motives for terminating you. Okay?
14   A. Okay, sir.
15   Q. And you state that one of the reasons that
16 you were terminated is that you had complained about
17 Hope's directions to you to chauffeur a client or
18 clients to nonmedical appointments away from home;
19 is that correct?
20   A. Yes.
21   Q. You complained about that?
22   A. Yes.
23   Q. And when did you complain about that?
24   A. Ever since then. Because -- because
25 client get -- because the client get different --

### Page 40

1  getting different funding on what -- on the
2  person -- I mean, the person who bring the client
3  outside, that's what they call rehabilitation, get
4  different funding.
5       MR. JOSEPHSON: But, David, he's just
6  asking you when you made your complaints right now.
7  BY MR. JULIUSSEN:
8       At this point. We'll talk about the rest
9  of it later.
10      When did you complain about those
11 chauffeuring duties?
12   A. Ever since then I complain. But it was
13 complained again when -- before I got terminated.
14   Q. When did you first complain about it?
15   A. Maybe October.
16   Q. October of what year?
17   A. 2004. 2004. I complained to --
18   Q. Well, you were terminated in September of
19 2004, correct?
20   A. Yes, sir.
21   Q. So you had to have complained about it
22 sometime before you were terminated?
23   A. Yes, sir.
24   Q. Do you recall when that was?
25   A. I don't remember. I don't remember the

### Page 41

1  exact date.
2    Q. And who did you complain to?
3    A. I complained to Mr. Roy Scheller, or Roy,
4  the director. I complain to Tonja. I complain to
5  the -- to the legal advisor. Legal advisor.
6    Q. Hope's legal advisor?
7    A. Yes, sir.
8    Q. And when you complained to any of these
9  people, did you put your complaint in writing?
10   A. No. No. I don't think so, I put it in
11 writing. But I went to the office, sir.
12   Q. So you complained to them in person?
13   A. Yes. And actually, I tell you, Mr. Roy
14 get -- get a letter too about that, on the paper.
15   Q. So you gave Roy a letter?
16   A. Roy give a letter.
17   Q. To you?
18   A. Yes, according to that paper.
19   Q. And what did Roy tell you in that
20 letter?
21   A. She going to look about it. She going
22 to -- I don't know exactly what it says, but, you
23 know, it says there, if I'm not mistaken, she going
24 to look about it. They're going to look about it.
25      And then that is also what he told me when

EXHIBIT A
Page 6 of 8

11 (Pages 38 to 41)

Page 42

1  we -- when I talked to him in his office, he was
2  going to talk about -- talk to the supervisor and
3  the director about that.
4      Q. Now, you -- so you complained to them
5  about chauffeuring clients to nonmedical
6  appointments. Is that --
7      A. No. I complain about -- that they like me
8  to bring the client outside the community. Since
9  there is a person which Hope paying -- which Hope
10 paying the person in different funding.
11     Q. So outside the community, what do you mean
12 by "outside the community"?
13     A. The exercise, they go to mall for exercise
14 and everything.
15     Q. So you mean outside the home?
16     A. Yes, sir.
17     Q. Within the community?
18     A. Right, sir.
19     Q. So, for instance, to take them down to the
20 Sears Mall or something like that?
21     A. Right, sir.
22     Q. Would you just take a look at Exhibit 6
23 again. That was the HAC job description.
24     A. Which one? Page what?
25     Q. On page 2. And look at No. 17.

Page 43

1      A. (Reviews document.)
2      Q. It was one of your duties as the HAC to
3  coordinate transportation to meet individuals' needs
4  including, but not limited to, backup van driving
5  duties; is that not correct?
6      A. Yes, I don't -- I bring -- I bring the
7  individuals on doctor's -- doctor's appointment, you
8  know, important things, important -- important --
9  important activities that they're going to doctor,
10 checkup, like that, to the dentist, whatever, you
11 know, I bring -- that's my duty.
12     Q. That's not what this says. This says to
13 work, comma, activities, et cetera. It doesn't say
14 anything about doctors or dentists, does it?
15     A. Let me...
16     Q. It was one of your duties, at least
17 according to your job description, to drive the
18 clients around the community, was it not?
19        MR. JOSEPHSON: Well, I think it's fair to
20 ask him what his understanding was but not to ask
21 him for a legal interpretation of what this language
22 means.
23 BY MR. JULIUSSEN:
24     Q. What does it mean to you?
25     A. It means to me it's only for going to

Page 44

1  doctor's appointment, you know. Not -- because if I
2  do that, I do that -- going to the community, I
3  did -- going to the community to bring out the
4  client. It's not how -- it's not my -- it's not
5  description to my -- to my position already.
6        Because my position is Home Alliance
7  Coordinator, coordination. If you define my job,
8  it's not for the -- for the person to bring to the
9  community in situations like that. It's in the
10 home. In the house. Coordination. Home Alliance
11 Coordinator. Not ISS.
12     Q. Isn't it true, Mr. Edades, that your job
13 would be whatever Hope told you it was? You were
14 employed by Hope?
15     A. Yes. Yes. Yes. And I'm not -- I'm
16 not -- I'm not against what they told me.
17 Actually -- actually, when I bring out the persons
18 in the -- in the rehabilitation, I have record every
19 day when I bring them. Because I know it's -- it's
20 not accordance to my job. I got records with the
21 attorney.
22     Q. You testified that when you looked at this
23 duty that was listed under paragraph 17 on page 2?
24     A. Yes.
25     Q. That to you that meant that you were to

Page 45

1  take the clients to doctor's appointments?
2      A. Yes, sir.
3      Q. But once Hope told you that's not what it
4  means, it means you take them anywhere we tell you
5  to take them, that was your job duty to do that, was
6  it not?
7      A. No. It's not. Because that's -- that's
8  what I said. This, on rehabilitation, the
9  individual got different funding, which not come
10 from my -- for my salary. I believe that. Because
11 this is from federal funding.
12     Q. You believe that, or you know that?
13     A. I know.
14     Q. You know? You have proof?
15     A. Yes.
16     Q. And what is your proof? Where is it?
17     A. Because -- because my wife was taking
18 individuals, because they have all respect is
19 different from their salary. This respect or
20 rehabilitation coming from different grants of
21 federal -- federal fund.
22     Q. So you're saying somebody else was being
23 paid to provide rehabilitation --
24     A. Right, sir.
25     Q. -- is that what you're saying?

EXHIBIT A
Page 7 of 8

12 (Pages 42 to 45)

## Page 30

1  THE WITNESS: Not giving their name?
2  MR. JOSEPHSON: Yeah. Just don't use
3  their name.
4  THE WITNESS: Oh, okay. Clients has 24
5  hours' supervision. And that 24 hours' supervision,
6  I believe Hope is -- Hope is, what is it? Charging
7  the individual for 24 hours. And those individuals
8  has 24 hours' supervision that is one-on-one
9  supervision. One individual, one care giver, 24
10 hours.
11 BY MR. JULIUSSEN:
12    Q. Okay. So you believe that Hope was being
13 paid to provide 24-hour-a-day care, and so you
14 should have been paid for providing 24-hour-a-day
15 care; is that what you're saying?
16    A. Yes, sir.
17    Q. But didn't you just tell me that any time
18 you actually provided care during the night that you
19 were paid for it?
20    A. Yes.
21    Q. So any of the care that you provided at
22 night when you had to get up out of -- and get up
23 during the night and care for someone, you were paid
24 for that, correct?
25    A. Yes.

## Page 31

1     Q. But you weren't paid when you were
2  sleeping, correct?
3     A. But what I'm running for is the -- the 24
4  hours is taking care of the individuals for one on
5  one. It's not -- Hope will not provide it.
6     Q. So your claim is simply based on the fact
7  that since you had to be there 24 hours a day and
8  the clients required 24-hour-a-day care, you should
9  have been paid for 24 hours a day even though you
10 didn't work 24 hours a day; is that correct?
11    A. Just like I'm working, sir, because they
12 don't like me to go out the house, for seven days a
13 week.
14    Q. Because you had to stay there while you
15 were on shift?
16    A. Yes.
17    Q. Okay. And that's all your claim is based
18 on?
19    A. All -- even though it's not my shift, even
20 my day off, they let me stay there during the night.
21 They don't like me to go out of the house. I
22 supposed to stay there for 24 hours.
23    Q. You weren't required to work on your days
24 off, were you?
25    A. Yes, but the requirement is stay in the

## Page 32

1  house during the night.
2     Q. But, once again, if you had -- if you woke
3  up and had to take care of a resident you would have
4  been paid for it, correct?
5     A. No, I get -- yes. Yes, yes. Yes, sir.
6     Q. Now, you also claim in your lawsuit that
7  you were wrongfully terminated, correct?
8     A. Right, sir.
9     Q. And why is it that you believe you were
10 wrongfully terminated?
11    A. Because they blame me things that I didn't
12 do it.
13    Q. And what things did they blame you for
14 that you didn't do?
15    A. Yes, sir.
16    Q. Which things didn't you do that they
17 blamed you for?
18    A. Just like they said about the cone,
19 urinary cone. They said that's my area, it's not my
20 area. They said I go out in the house, that the
21 person that I left is not -- not supposed to be left
22 in the house. The person that take care of that
23 person, within ten minutes, not supposed to be
24 there, you know.
25    Q. So you left an unqualified person --

## Page 33

1     A. Qualified. I left a qualified person
2  there, sir.
3     Q. But they said that the person wasn't
4  qualified, correct?
5     A. That's right, sir. Yes.
6     Q. Anything else?
7     A. They tell me to go out -- when they give
8  me suspension, they tell me to go out in the
9  house -- they call me -- they call me 5 o'clock in
10 the afternoon. And my supervisor tell me to go, to
11 take all my things out of the house, because she's
12 coming, she's coming for 9 o'clock in the evening.
13 And she told me, take out all your things in the
14 house because you cannot go back there anymore.
15 That's the word she told me.
16    Q. Now, you mentioned a suspension.
17    A. Yes, sir.
18    Q. That wasn't necessarily something that was
19 going to be permanent, was it? That was only a
20 suspension pending investigation; is that correct?
21    A. Yes, but there's an investigation not
22 going on at the time.
23    Q. We'll talk about that. But at that time
24 you hadn't been told you could never come back?
25    A. Yes, sir. That's what my supervisor told

EXHIBIT A   Page 8 of 8