Joe P. Josephson, Esq.,
Josephson & Associates, P. C.
912 West 6th Avenue
Anchorage, Alaska  99501
(907) 276-0151
(907) 276-0155 [facsimile]
Alaska Bar No. 6102018

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

_____
DAVID EDADES,                      )
                                   )
     Plaintiff,                    )
                                   )
  v.                               )
                                   )
HCR, INC., d/b/a                   )
HOPE COMMUNITY RESOURCES,          )
and HOPE COTTAGES,                 )
                                   )
     Defendant.                    )   Case No. 3:05-CV=00230-(TMB)
_____)

**MEMORANDUM FOR PLAINTIFF OPPOSING DEFENDANT'S**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

    **I.  Legal Standards.**

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed.R.Civ.P. 56(c).  The moving party bears the initial burden to point out the absence of any genuine issue of material fact.  If and when the initial burden is satisfied, the burden shifts to the opponent to demonstrate through probative evidence that there

remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. *Robi v. Reed*, 173 F.3d 736, 739 (9th Cir.), *cert. denied*, 120 S.Ct. 375 (1999).

**II.   The Overtime Issue Is Not Susceptible to Summary Judgment Adjudication.**

The evaluation of overtime issues under the FMLA is fact-sensitive. As the Supreme Court has said, regarding "waiting time",

> . . .Whether in a concrete case such time fails within or without the Act is a question of fact to be resolved by appropriate findings of the trial court. *Walling v. Jacksonville Paper Co*., 317 U.S. 564, 572 [63 S.Ct. 332, 87 L.Ed. 460, 468]. This involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances. Facts may show that the employee was engaged to wait, or they may show they waited to be engaged. His compensation may cover both waiting and task, or only performance of the task itself. Living quarters may in some situations be furnished as a facility of the task and in another as a part of its compensation. The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was.

*Skidmore v. Swift & Co*., 323 U.S. 134-137, 65 S.Ct. 161, 163, 89 L.Ed. 124, 127 (1994), quoted by the Ninth Circuit Court of

*Appeals in Irwin v. Clark*, 400 F.2d 882, 884 at n. 2 (1968), *cert. denied* 393 U.S. 1062, 21. L.Ed. 2d 706, 89 S.Ct. 715 (1969).

As provided in 29 CFR Ch. V, sec. 785.17,

> An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while 'on call'. An employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call."

HCR relies upon an "agreement" which it drafted and presented to David. It is to be noted that the so-called "agreement" is neither a negotiated collective bargaining contract agreed upon at arm's length nor a bilateral agreement developed by employer and employee.

Instead, the "agreement" was the unilateral decision of the employer, and so is not an "agreement" "mutually agreed upon". *Hultgren of County of Lancaster*, 913 F.2d 498, 506 (8th Cir. 1990)[sleep time policy was unilaterally created by the employer and contracts were presented to the employees on a take-it-or-leave-it basis]. In *Hultgren*, the court cited a 1985 opinion letter from the Wage and Hour Deputy Administrator which stressed that only "mutually agreed-upon" sleep time may be excluded.

And, as Judge Lay in his dissent in *Bouchard v. Regional*

Memo Opposing Motion for Summary Judgment         3

*Governing Board of Region V Mental Retardation Services*[1], 939 F.2d 1323, 1327 (8th Cir. 1991), cited by HCR,

> The majority contends there was no evidence that the employees refused to sign the agreement but it is difficult to refuse to sign under the duress of a withheld paycheck.

Under federal regulations as interpreted both by the Department of Labor and case law, the express or implied agreement must be voluntary, must usually be in writing, and must not be signed by the employee under duress (including but not limited to threat of termination); it must not be a unilateral decision of the employer. **See** <u>DOL Field Operations Handbook,</u> sec. 31b18(b); *Johnson v. City of Columbia*, 949 F.2d 127 (4th cir. 1991).

Furthermore, any agreement inconsistent with the Fair Labor Standards Act is unenforceable. *Berry v. County of Sonoma*, 763 F.Supp. 1055, 1059 (D.C.N.D.Cal. 1991). To hold otherwise, would "nullify the purposes" of the Fair Labor Standards Act. *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728i at 740 (1981).

**III. HCR, INC. Has Failed to Show That It Had Legitimate, Non-Discriminatory Reasons to <u>Terminate David.</u>**

David's evaluations by his employer belie the idea that he was not a satisfactory employee.

---

[1] Bouchard was decided by the District court only after a thorough trial, and not on

Defendant devotes one narrative paragraph, at page 10 of its Motion, to an attempt to demonstrate that David was terminated for "performance errors."

The "performance errors" are easily refuted.

Three errors are cited.

A. *Leaving a Client with Mrs. Edades.*

First, it is claimed that David was suspended on August 25, 2004, for leaving a client in the care of his wife, Domie Edades.[2]

But Domie herself was a trained employee of HCR.[3] The arrangement whereby she cared for clients during brief periods had been approved by management.[4]

Domie explains that on the occasion in question, David was gone for just ten minutes, getting a soda at a nearby store for one of the clients who was hitting himself and unable to talk. Domie notes that in those instances, "we provided a soda to the client, *but on this particular day, there was no soda available.*"

B. *"Rodent Feces".*

The "rodent feces" claim, as a reason to terminate David, is clearly bogus. The claim itself adds insult to injury (as

---

summary judgment.
[2]   Exhibit 7.
[3]   Affidavit of Domie Edades, page 3, para. 6; dep. Of David Edades, at 33.
[4]   *Id.;* dep. of David Edades, at 74-75.

Memo Opposing Motion for Summary Judgment          5

well as injury to insult).

David brought the problem to the attention of his supervisor. She responded that she would "talk to the landlord", because Hope was not responsible for fumigating the house.[5]

### C. *Medication Storage.*

Mrs. Edades's affidavit explains that the defendant's Policy and Procedure gives the home provider or supervisor of the residence the latitude to store medication in unlocked containers.[6] Mrs. Edades notes that the container David utilized to store unused medications was always kept high in a kitchen cabinet, in the same location.[7] Mrs. Edades adds:

> That arrangement was never brought up during the four years of David's employment, until the employer decided to terminate him.[8]

### D. *David's Annual Evaluations.*

David's earliest evaluation, essentially for 1999, praises the high quality of David's work, and his industriousness, and comments that "David performs above average in the areas of personal care and home maintenance.[9]

---

[5] Dep. of David Edades, at 89. Domie's affidavit, page 2, paragraph 4B, notes that David was long concerned about the rodent feces issue. She adds that she bought a small mouse trap to allay the ongoing problem out of her personal funds.

[6] Affidavit of Domie Edades, para. 4A, p. 2; see Exhibit 1 attached (HCR Bates Stamp No. 0352).

[7] *Id.*

[8] *Id.*

[9] Exhibit 2

David's second evaluation[10], essentially for 2000, is also positive. (However, at page 4 of the evaluation, a comment is made that "(c)onflicts with supervisors generally focus on issues of overtime approval.") At page 6, the evaluator comments that David "ensures that (the men he supports) have a healthy environment to live in."

The third evaluation[11], essentially for 2001, praises David for work of consistently high quality, and for his industriousness. At page 2, the observation is made that David "is very safety conscious with the individuals (and) ensures the environment is safe. . . By following up on any maintenance issues and keeping the house clean and free of clutter." On the same page, it is noted that "There have been a few circumstances in the past when David has risen his voice with his Supervisor when he had not agreed with a policy."

The fourth evaluation[12], essentially for 2003, the last evaluation provided by defendant, is very similar, calling David "organized" and "tidy" and "thorough in getting tasks done in the home."

Of course, HCR may argue that David underwent some major alteration in his work and conduct, but it cannot be said, viewing the record in the light most favorable to David, that

---

[10]    Exhibit 3.
[11]    Exhibit 4.

a fair reading of the record would support that argument, if made.

More logically, David was retaliated against because of his complaints about the transportation of his clients, which had their genesis in safety concerns.[13]

Management's bad faith is made manifest by the "Work Improvement Program" and how it was administered.[14]

First, the "Work Improvement Program" included vague and subjective goals, *e.g.*, "to improve his listening and communication skills" and to "communicate with staff, supervisors, directors, etc. in a professional and positive manner at all times."

Second, the "Work Improvement Program" was ostensibly a 30-day program, ending on September 16, 2004, but David was terminated approximately half-way through it. While the last paragraph of the Program reserved Management's right to terminate at any time during the 30-day period "when performance progress is judged not to be adequate", of the three purported bases for termination cited in the defendant's Motion and Memorandum, only one - "cleanliness of the house" -- is even mentioned in the Work Improvement Program.

It is evident that David simply became *persona non grata*

---

[12]   Exhibit 5.
[13]   Affidavit of Domie Edades, pages 1-2, para. 3.

at the worksite, and the "Work Improvement Program" was not designed for success, but for failure. Management sought to retaliate against David because of his concerns and questions, and management succeeded. David's concerns arose from his concerns about public duty and societal obligation, and involved a matter of important public interest. Thus, David's expression of his concerns was a "protected activity".[15] Unquestionably, the employer knew of the protected activity.

Because few managers baldly state that they are retaliating, courts have held that proof of causation

> can be established either indirectly by means
> of circumstantial evidence, for example, by
> showing that the protected activity was
> followed by adverse treatment in employment,
> or directly by evidence of retaliatory animus.

*Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003).

David's discharge was improperly retaliatory and violated the implied covenant of good faith and fair dealing which inures in every Alaska employment relationship. *Guin v. Ha*, 591 P.2d 1281 (Alaska 1979).[16]

---

[14]   Exhibit 6.
[15]   "Protected activity" includes the exercise by the employee of his First Amendment rights to free speech. *Lytle v. Clark County School District*, 382 F.3d 978 (9th Cir. 2004). Although Lytle involved public-sector employment, the judgment, as reported in Alaska Employment Law Letter, Vol. 9, No. 11 (November 2004), attached, "reiterates important principles applicable to all employers whose employees have engaged in some form of protected activity." Exhibit 8.
[16]   For the application of the implied covenant of good faith and fair dealing in the

## Conclusion

Defendant's motion for summary judgment should be denied. Alternatively, if the court finds that there is no federal question, but that David's common law claim should proceed the trial, then the case should be re-transferred to the Superior Court for the State of Alaska for disposition of plaintiff's claim for wrongful termination.

DATED July 31, 2006.

/s/ Joe P Josephson
912 West 6th Ave
Anchorage AK 99501
Phone: (907) 276-0151
Fax: (907) 276-0155
E-mail: jjosephson@aol.com
Alaska Bar No. 6102018

Certificate of service

I certify that on the 1$^h$ day of August, 2006, a true and correct copy of the foregoing document was served electronically on the following:

James H. Juliussen

   /s/ Joe P. Josephson

---

employment context, **see**, *e.g.,* Jones v. Central Peninsula General Hospital, 779 P.2d 783 (Alaska 1989).