DAVID EDADES  
May 30, 2006

3:03-cv-00230-(TMB)

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

DAVID EDADES,                )
                             )
        Plaintiff,           )
                             )
    vs.                      )
                             )
HCR, INC., doing business as HOPE  )
COMMUNITY RESOURCES, and     )
HOPE COTTAGES,               )
                             )
        Defendant.           )
_____)

Case No. 3:05-cv-00230-(TMB)

COPY

DEPOSITION OF DAVID EDADES

Pages 1 - 98, inclusive

Tuesday, May 30, 2006, 10:05 a.m.

Anchorage, Alaska

Taken on behalf of the Defendant
at
Davis Wright Tremaine
701 West 8th Avenue, Suite 800
Anchorage, Alaska

Page 32

1  house during the night.
2      Q.  But, once again, if you had -- if you woke
3  up and had to take care of a resident you would have
4  been paid for it, correct?
5      A.  No, I get -- yes.  Yes, yes.  Yes, sir.
6      Q.  Now, you also claim in your lawsuit that
7  you were wrongfully terminated, correct?
8      A.  Right, sir.
9      Q.  And why is it that you believe you were
10 wrongfully terminated?
11     A.  Because they blame me things that I didn't
12 do it.
13     Q.  And what things did they blame you for
14 that you didn't do?
15     A.  Yes, sir.
16     Q.  Which things didn't you do that they
17 blamed you for?
18     A.  Just like they said about the cone,
19 urinary cone.  They said that's my area, it's not my
20 area.  They said I go out in the house, that the
21 person that I left is not -- not supposed to be left
22 in the house.  The person that take care of that
23 person, within ten minutes, not supposed to be
24 there, you know.
25     Q.  So you left an unqualified person --

Page 33

1      A.  Qualified.  I left a qualified person
2  there, sir.
3      Q.  But they said that the person wasn't
4  qualified, correct?
5      A.  That's right, sir.  Yes.
6      Q.  Anything else?
7      A.  They tell me to go out -- when they give
8  me suspension, they tell me to go out in the
9  house -- they call me -- they call me 5 o'clock in
10 the afternoon.  And my supervisor tell me to go, to
11 take all my things out of the house, because she's
12 coming, she's coming for 9 o'clock in the evening.
13 And she told me, take out all your things in the
14 house because you cannot go back there anymore.
15 That's the word she told me.
16     Q.  Now, you mentioned a suspension.
17     A.  Yes, sir.
18     Q.  That wasn't necessarily something that was
19 going to be permanent, was it?  That was only a
20 suspension pending investigation; is that correct?
21     A.  Yes, but there's an investigation not
22 going on at the time.
23     Q.  We'll talk about that.  But at that time
24 you hadn't been told you could never come back?
25     A.  Yes, sir.  That's what my supervisor told

Page 34

1  me.
2      Q.  That you would never be coming back?
3      A.  That you cannot go back anymore, you
4  cannot go back there anymore in the house, take your
5  things.
6      Q.  Until Hope tells you you can?
7      A.  What's that?
8      Q.  You couldn't go back until Hope told you
9  you could go back, correct?
10     A.  No.  That's not the words they give me.
11     Q.  So you understood at that time that you
12 were terminated, that you were fired?
13     A.  Yes.  Terminate, but exactly I am fired
14 right at that time, because of the work.
15     Q.  Where did you go when you were
16 suspended?
17     A.  The first time they said just go out in
18 the house.  Where I'm going, I told them, I said.
19 No, I don't know where you going, just go ahead.
20         And then one of the -- one of the guardian
21 was there at the time and said, why don't you put
22 them in a hotel, before -- you know, before, so that
23 they have something to sleep.  The guardian said.
24 And then I don't know, my supervisor call somebody
25 in the office, and then they told us to go to the

Page 35

1  hotel.
2      Q.  And Hope paid for it?
3      A.  Yes, sir.
4      Q.  So when they told you to leave the house,
5  they then put you in a hotel and paid for the
6  room?
7      A.  Right, sir.
8      Q.  Do you own a home?
9      A.  No.
10     Q.  Did you ever own a home while you worked
11 at Hope?
12     A.  No -- where, Alaska?
13     Q.  When you worked at Hope, did you own a
14 home in Anchorage?
15     A.  No.
16     Q.  At any time that you -- when you worked
17 for Hope in the HAC position, the HAC position?
18     A.  Yes, sir.
19     Q.  Did you have another house of your own?
20 Did you rent a house?
21     A.  No, sir.
22     Q.  Did you rent an apartment?
23     A.  No.
24     Q.  So if you weren't living at Hope, you
25 didn't have anywhere to live; is that correct?

DAVID EDADES                                                                 3:03-cv-00230-(TMB)
May 30, 2006

Page 72

1  document?
2  A. Yes, sir. I've seen this before, you
3  know. This -- this is kind of -- most of this one
4  is not true so I never sign it.
5      MR. JOSEPHSON: He's asking about the
6  first page.
7  BY MR. JULIUSSEN:
8  Q. But the first page is something you've
9  seen before, correct?
10 A. Yes, sir.
11 Q. And that indicates that you were first
12 employed by Hope on 1/26 of 1999; is that correct?
13 A. Yes, sir.
14 Q. You don't have any reason to doubt the
15 validity of that?
16 A. Right.
17 Q. And it appears as though your termination
18 was effective on 9/2 of '04, is that correct,
19 September 2nd of 2004?
20 A. Yes, sir.
21 Q. Does that appear to be correct?
22 A. Yes, sir.
23 Q. Now, if you turn to the second page,
24 you've seen this document before too, have you not?
25 The two-page document, you've seen it -- or three

Page 73

1  pages, excuse me. You've seen those before?
2  A. This one?
3  Q. Yes.
4  A. Yes. Before my termination.
5  Q. And that's the one that you refused to
6  sign?
7  A. Yeah.
8  Q. And you refused to sign it?
9  A. Yes, sir.
10 Q. And that was because?
11 A. It's not true.
12 Q. Okay.
13 A. Most of this is not true.
14 Q. Let's start right up at the top.
15 A. Yes, sir.
16 Q. The first part just gives your name and
17 your position and the network/team. The next part
18 says, "Previous re-direction has occurred on 7/16/04
19 and 8/26/04." Do you know what that means?
20 A. Yes.
21 Q. What happened on 7/16/04?
22 A. Okay. They allege that -- that I left the
23 individual for ten minutes. But I never left
24 individual by themself alone. I left my individual
25 to my wife. But my wife is working at Hope too.

Page 74

1  And he was trained in this house. And my wife, we
2  got -- we got agreement before with Robin -- Pam
3  Hawkins -- no. Gina, that my wife can -- can work
4  emergency basis.
5      And since my client -- my client is -- got
6  hyper at the time and he like soft drinks. So I
7  prepared to go to the store to buy soft drinks for
8  him. And then that's the time the director Sheri
9  and legal advisor of Hope was -- went to the house,
10 went to my house.
11     And I tell them I went to the -- I went to
12 the store and buy some soda for Brad, because he's
13 very hyper and getting -- yelling again, I said, and
14 I left my wife. I never left that individual for --
15 to the people who are not trained in that house.
16 Q. Did your wife get paid for the time that
17 she was watching the client?
18 A. No. No, sir. Because who -- -- who
19 will -- who will come to the house for ten minutes
20 to work. If I call you, come to the house, then
21 because I'm going to the store for ten minutes. Did
22 somebody like it? No, nobody like it, I think.
23     Since my wife was trained to that house,
24 and the guardian want him to work in that house, so
25 I have -- I get state of mind that, oh, I can leave

Page 75

1  my wife for ten minutes and I'll go buy something
2  for the individual, because she's working there.
3  Q. She's working where?
4  A. In Hope.
5  Q. At Hope?
6  A. Yes.
7  Q. But not in that house while you're working
8  in the house, correct?
9  A. Yes. But we get agreement that in
10 emergency basis she can work over there.
11 Q. And on 7/16 of 2004 they told you not to
12 do that, correct?
13 A. No, they never said anything. Only this
14 time they tell me.
15 Q. But at that time they told you not to do
16 it?
17 A. No. No, sir. Because at that time
18 said -- when -- when the director and the legal
19 advisor went out, went home already, I said, oh,
20 what you going to tell about the house, what is
21 your -- what's your comment, I said like this.
22     They tell me, oh, don't worry, David, your
23 house is clean, everything is okay. But then the
24 next day they write me up with this one. They never
25 say anything.

21 (Pages 72 to 75)

DAVID EDADES  
May 30, 2006
3:03-cv-00230-(TMB)

### Page 88

1  what you call that? Your service anymore. You've
2  been let off.
3      It hurts me, you know, Ms. Hendrickson
4  tell me that. I try to explain before, but, you
5  know, you don't like to listen to me, you listen
6  only one person.
7      Q. Okay. Now, in paragraph 3, this goes on
8  to say that on September 1st of 2004, that the
9  on-call staff and the home nurse reported that there
10 were medication errors that had not been reported,
11 is that correct, is that what it says?
12     A. Medication error?
13     Q. Medication errors.
14     A. No. No. There's no medication.
15     MR. JOSEPHSON: He's asking you whether
16 paragraph 3 says that. Look at paragraph 3.
17     THE WITNESS: (Reviews document.)
18     I was not in the house already at that
19 time, sir.
20 BY MR. JULIUSSEN:
21     Q. So there were no medication errors while
22 you were --
23     A. Yes.
24     Q. -- the HAC?
25     A. Yes, sir.

### Page 89

1      Q. There were?
2      A. No.
3      Q. There were none?
4      A. Huh-uh.
5      Q. Okay. So this isn't true, this had
6  nothing to do with you?
7      A. No, this is not true.
8      Q. Okay. And then on numbered paragraph 4,
9  it was noted that on 9/1 there was some rodent feces
10 in drawers in the HAC living quarters and on the
11 floors. Is that true?
12     A. Yes. This is true. But, again, I talk to
13 the supervisor that get rodent over there, I never
14 see that much rodent, but I will try to -- to kill
15 those rats, more rats by putting trap. Because --
16 because I said to her that I don't like to put
17 poison in the house because of the individuals.
18     And I said -- and they told me, okay,
19 David, I will now talk to the landlord about this.
20 Because I think Hope is not responsible for
21 fumigating the house. That's what they told me
22 exactly.
23     Q. But you were responsible for keeping the
24 house clean, correct?
25     A. Yes, sir. Yeah.

### Page 90

1      Q. So if there was rodent feces in the
2  drawers or in your living quarters or on the floors,
3  it was your responsibility to clean that up?
4      A. In my living quarters, yes, sir, but not
5  in the upstairs.
6      Q. Let's talk for just a couple of minutes
7  about what you have done since you left Hope. You
8  were terminated on September 2nd --
9      A. Yes.
10     Q. -- 2004. And is it true that you have not
11 worked since that time?
12     A. Yes, sir.
13     Q. Is it also true that you have only applied
14 for employment once since you were terminated?
15     A. No. No, sir.
16     Q. It's not true?
17     A. Yeah. Because I applied on phone,
18 telephones, you know, I called houses, individuals.
19 I apply by phone. By phone. And I look on the --
20 on the newspaper about what I know. And I only get
21 application in ASETS, at ASETS, and I fill out
22 application over there.
23     And, okay. I put Hope Cottages as my
24 reference on there, on the place I work and I put my
25 reference over there. And I said to my -- to my

### Page 91

1  application that they can call Pam Hawkins for my
2  reference.
3      Everything -- everything that I go,
4  there's no -- they don't call me up. Anything.
5      Q. I want to know every place that you
6  submitted an application to.
7      A. Now I apply in --
8      Q. Why don't we start at the beginning.
9      A. I apply at ARC that time, first time. Now
10 I apply -- what you call that? In ASSET. I even
11 apply in Value Village. Nobody call me.
12     Q. Where is the first place that you applied
13 for after you left Hope?
14     A. I apply in houses by phone.
15     Q. To house sit?
16     A. No, no. I applied to the person to get
17 individual in the house. Private -- private care
18 giver that you need -- need -- what you call that?
19     Q. You applied by phone?
20     A. Yes, sir.
21     Q. Did you submit an application?
22     A. No.
23     Q. When was that; do you recall?
24     A. After my layoff.
25     Q. Excuse me? Right after you were laid

25 (Pages 88 to 91)